**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| J.P. MORGAN CHASE BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:07 CV 202 |
| vs. | ) | |
| | ) | |
| DRYWALL SERVICE & SUPPLY | ) | |
| CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER and OPINION

This matter is before the court on a motion for leave to amend the complaint
(Pl.'s Mot. for Leave to File Am. Compl. and to Extend Certain Management Deadlines,
DE # 68) and a joint motion to modify the deposition deadline. (Joint Mot. to Modify
Dep. Deadline, DE # 74.) For the reasons explained below, the motion to amend the
complaint will be **DENIED** and the motion to modify the deposition deadline will be
**GRANTED**.

## I.    BACKGROUND

### A.    *Factual Background*

A brief overview of the facts underlying this case is helpful for understanding
the motion for leave to amend.[1] Defendant Drywall Service & Supply Co., Inc.
("Drywall") had a checking account with plaintiff J.P. Morgan Chase Bank NA
("JPMC"). (Aff. of James Treat in App. to Def.'s Brief in Opp'n to Summ. J. 3, DE # 59-2.)

---

[1] A more thorough overview of the facts of this case is provided in the court's order
on plaintiff's motion for summary judgment. (Order Den. Summ. J., DE # 62.)

In June 2002, the two parties entered an agreement whereby JPMC would extend

Drywall a line of a credit, with a limit of $250,000, which would be deposited into

Drywall's checking account upon request. (*Id*; Aff. of Esther R. Bullock in Attach. to

Brief in Supp. of Mot. for Summ. J. 2, DE # 39-11.) Drywall agreed to pay interest on any

amount that it drew on the line of credit. (Promissory Note 1 in Attach. to Compl. 1,

DE # 1-2.) To secure the line of credit, Drywall granted JPMC a security interest in all its

inventory, accounts, chattel paper, equipment, and general intangibles and JPMC

perfected that interest. (Bullock Aff. 2, DE # 39-11.)

The security agreement was formalized in a promissory note signed by Drywall's

president and whole-owner, James Treat ("Treat"). (Promissory Note in Attach. to

Compl. 1-2, DE # 1-2.) The promissory note was supplemented by a commercial

security agreement (Commercial Security Agreement in Attach. to Compl. 1-5,

DE # 1-3), and JPMC also required Drywall to submit a "corporate resolution" that

designated Treat as the only officer able to take certain actions, including borrowing

and incurring any indebtedness or credit accommodations, on Drywall's behalf.

(Corporate Resolution in Attach. to Def.'s Answer 1, DE # 9-2.)

Treat alleges that he never authorized anyone else to take action on Drywall's

line of credit agreement and that he never requested any draws against the line of

credit. (Treat Aff. 3, DE # 59-2.) Still JPMC ended up depositing $250,000, drawn from

the line of credit, into Drywall's checking account in three deposits. (Bullock Aff. 2-3,

DE # 39-11.) These deposits were indicated on checking account statements and

statements for the line of credit that JPMC claims to have sent to Drywall. (Bullock Aff. 3, DE # 39-11.) Some interest payments were made on the line of credit. (Treat Aff. 4, DE # 39-11.) JPMC claims that Treat "personally requested at least one draw" and cites to a letter it received on Drywall letterhead with Treat's alleged signature. (Pl.'s Brief in Supp. of Summ. J. 6, DE # 39; Letter from Treat in Attach. to Pl.'s Brief in Supp. of Summ. J. 4, DE # 39-4.)

Drywall claims that its former employee, Christina Robbins ("Robbins"), was the person who requested the draws against the line of credit, received the bank statements, and made the interest payments on its behalf. (Treat Aff. 5-8, DE # 59-2.) In a separate criminal proceeding, Robbins plead guilty to the felony of wire fraud, admitting that she defrauded Drywall and Treat by writing checks from Drywall's checking account to herself and her husband and by wiring money from Drywall's accounts to her creditors to pay her personal debt. (*Id.* at 46.) She also admitted to hiding her fraud from Drywall by manipulating its books, mail, and records. (*Id.*) Drywall defaulted on the line of credit and has not returned the amounts owed on it. (Bullock Aff. 4, DE # 39-11.)

B.    *Procedural Background*

The original complaint in this suit listed two claims–enforcement of note and foreclosure of security interest–and was filed on May 1, 2007 by JPMC. (Pl.'s Compl., DE # 1.)[2] On October 17, 2008, JPMC moved for summary judgment on these claims.

---

[2] Meanwhile, Drywall has filed two state law suits, arising from the same series of events, against JPMC in state court on May 25, 2007, and April 21, 2008. (Pl.'s Mot. for Summ. J. 19, DE # 38.)

(Pl.'s Mot. for Summ. J. 1, DE # 38; Pl.'s Compl. 3-4, DE # 1.) This court denied that

motion on April 22, 2009. (Order Den. Mot. for Summ. J., DE # 62.) JPMC filed a motion

for reconsideration of the summary judgment order (Pl.'s Mot. for Recons., DE # 63)

which was denied by the undersigned on June 3, 2006. (Order Den. Mot. for Recons.,

DE # 65.) On August 7, 2009, JPMC moved to amend its complaint to include claims of

unjust enrichment, recoupment, breach of account rules and regulations, and rescission.

(Pl.'s Mot. to Am. Compl. 6-9, DE # 68-2.) Drywall responded (Def.'s Resp. in Opp'n to

Mot. to Am. Compl., DE # 73), plaintiff replied (Pl.'s Reply to Def.'s Resp. in Opp'n to

Mot. to Am. Compl., DE # 76), and Drywall was granted leave to file a sur-reply which

it did on September 9, 2009. (DE ## 77, 78, 79). JPMC was granted leave to file a limited

response to Drywall's sur-reply and did so on September 16, 2009. (DE ## 80, 81, 82.)

During a preliminary pretrial conference on July 24, 2007, the initial discovery

deadline in this case was set for April 30, 2008. (Rule 16 Prelim. Pretrial Conference,

DE # 17.) In April, 2008, the parties agreed that the deadline for completing depositions

should be sixty days following the ruling on any dispositive motion. (Pl.'s Mot. for

Extension of Time to Complete Disc. 3, DE # 27; Order Granting Mot. for Extension of

Time to Complete Disc., DE # 28.) The parties gave three reasons for requesting that the

deposition deadline be set for after the dispositive motion deadline: 1) the parties hoped

to limit the number of depositions by covering topics relevant to the state and federal

litigation in the same depositions and the state suits were just beginning; 2) the parties

wished to reduce costs by attempting mediation before the depositions were held; and

3) the parties anticipated that dispositive motions would be filed and sought to reduce costs by having these motions decided before undertaking depositions that may be rendered unnecessary by the decisions. (Pl.'s Mot. for Extension of Time to Complete Disc. 3, DE # 27.) The court granted that motion, setting the deadline for all non-deposition discovery for May 30, 2008 and the dispositive motion deadline for sixty days later. (Order Granting Mot. for Extension of Time to Complete Disc, DE # 28.)

On September 16, 2008, after the dispositive motion deadline had passed, JPMC moved to extend the dispositive motion deadline to October 17, 2008 (Pl.'s Mot. for Extension of Time to File Dispositive Mot., DE # 30), and this court granted that motion on September 23, 2008. (Order Granting Mot. for Extension of Time to File Dispositive Mot., DE # 35.) In the same order, this court reassigned the case to the magistrate judge to handle any discovery issues that had not been resolved, noting that discovery appeared to be ongoing in this case because depositions had not been taken and there was possibly a dispute about JPMC's responses to Drywall's discovery requests. (*Id.* at 3.) However, after this order, neither party moved to reopen or extend the discovery period. (Order Den. Mots. to Compel and Mot. for Extension of Time 1, DE # 55.)

Almost a month later, JPMC moved for summary judgment. (Pl.'s Mot. for Summ. J., DE # 38.) Drywall twice moved for an extension of time to file its response and the motion was granted twice. (DE ## 40, 41, 42, 43.) On January 30, 2009, Drywall

filed a third motion for extension of time and four separate motions to compel.[3] (Def.'s Mot. to Compel Complete and Sufficient Admis. Resp. from Pl., DE # 45; Def.'s Mot. to Compel Complete and Sufficient Interrog. Answers from Pl., DE # 48; Def.'s Mot. to Compel Complete Doc. Produc. Resp. from Pl., DE # 51; Def.'s Mot. to Compel Complete and Sufficient Admis. Resp. from Pl., DE # 54.)

Magistrate Judge Christopher A. Nuechterlein denied all five of these motions on February 5, 2009. (Order Den. Mots. to Compel and Mot. for Extension of Time, DE # 55.) In support of denial of the motions to compel, the order stated, "[t]his Court takes its deadlines seriously. The discovery period closed over nine months ago." (*Id.* at 2.) Drywall filed an emergency motion for reconsideration on the order (Def.'s Emergency Mot. for Immediate Recons. of Magistrate's Feb. 5, 2009 Order, DE # 56) which this court denied. (Order Den. Def.'s Mot. for Immediate Recons., DE # 57.)

The parties are now requesting a deposition deadline of sixty days after a denial of the motion to amend or, in the case that the motion to amend is granted, a deadline set for after the deadlines for any additional written discovery. (Joint Mot. to Modify Dep. Deadline 2, DE # 74.)

C.      *Legal Background*

JPMC argues that it should be able to amend its complaint because it originally focused only on the breach of contract claim and after its summary judgment motion for

---

[3] One of these was filed on February 2, 2009. (Def.'s Mot. to Compel Complete and Sufficient Admis. Resp. from Pl., DE # 54.)

that claim was denied, it wishes to proffer alternative theories of recovery. (Pl.'s Mot. for Leave to Am. Compl. 2, DE # 68.) JPMC contends that it is not filing the motion for the purpose of undue delay or from a dilatory motive and that Drywall will not suffer any prejudice or delay if an amended pleading is allowed. (Pl.'s Mot. for Leave to Am. Compl. 4, DE # 68.) JPMC also notes that no depositions have been taken yet. (*Id.*)

In response, Drywall argues that the court should deny JPMC leave to amend because JPMC has not explained why it waited more than two years to amend its complaint, discovery closed, JPMC is seeking to avoid the consequences of the court's summary judgment decision, granting the motion would be extremely prejudicial to Drywall, and the new case management deadlines suggested by JPMC are onerous and oppressive to Drywall and make no provision for a deadline for dispositive motions on the new claims. (Def.'s Resp. to Mot. to Am. Compl. 1-2, DE # 73.)

In reply, JPMC contends that the primary reason Drywall will not suffer any prejudice from an amended complaint is that the amended complaint is directed to the theory of defense that Drywall stated in its summary judgment briefing. (Pl.'s Reply to Mot. to Am. Compl. 1, DE # 76.) JPMC also argues that discovery in the case has not closed, that it did not seek to file an amended complaint in order to avoid summary judgment, and that it did explain its need to amend. (*Id.* at 3-8.) Drywall responds that JPMC was made aware of Drywall's theory of defense in the answer to the complaint and that JPMC could have amended its complaint then. (Def.'s Sur-reply to Mot. to Am. Compl. 2, DE # 79.) JPMC argues in response that Drywall had generally asserted this

defense in its answer but didn't provide details until it submitted its summary judgment briefings. (Pl.'s Limited Resp. to Mot. to Am. Compl. 1-2, DE # 82.)

## II. STANDARD OF REVIEW

Courts should "freely give leave [to amend] when justice so requires," FED. R. CIV. P. 15(a)(2); but leave to amend is not granted automatically. *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007). Leave to amend should be "freely given" if "the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Even so, courts may deny leave to amend if there is an apparent or declared reason for doing so, such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment or futility of amendment." *Liu v. T&H Machine*, 191 F.3d 790, 794 (7th Cir. 1999) (quoting *Foman*, 371 U.S. at 182).

In deciding whether or not to grant leave to amend, the court can also consider the burden that granting to leave to amend would place on the judicial system. *Tamari v. Bache & Co. S.A.L.*, 838 F.2d 904, 909 (7th Cir. 1988); *see also Perrian v. O'Grady*, 958 F.2d 192, 195 (7th Cir. 1992) ("Because substantive amendments shortly before trial serve to defeat the public's interest in speedy resolution of legal disputes, [a] district court judge is entitled, in such circumstances, to refuse to allow a plaintiff's amendment.") (internal citations and quotations omitted).

**III.    ANALYSIS**

JPMC's proposed amendment proffers new legal theories that rely on facts and circumstances that were alleged in the original complaint. Thus, these new legal theories and the facts and circumstances that underlie them may provide a proper subject of relief for JPMC. *Foman*, 371 U.S. at 182. Therefore the court must look at the other *Foman* factors to determine whether there are sufficient reasons for denying leave nonetheless.

   *A.    Undue Delay*

Undue delay alone is insufficient to support denial of leave to amend, but it may militate towards a denial when combined with another factor, often unfair prejudice to the nonmoving party. *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 793 (7th Cir. 2004). When determining whether undue delay has occurred, courts will consider the similarity of the factual basis for the claims in the original complaint to the new claims raised in the amended complaint, the moving party's explanation for waiting to raise the new claims, whether the moving party is attempting to introduce a new theory of the case, and whether granting the motion to amend will require new or duplicated discovery efforts. *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 861 (7th Cir. 2001); *Johnson v. Methodist Med. Ctr. of Ill.*, 10 F.3d 1300, 1304 (7th Cir. 1993); *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353-354 (7th Cir. 1982).

If the moving party fails to provide any explanation for not filing its amendment sooner or if the explanation it provides is inadequate, that will weigh towards denying

leave to amend. *Sanders, et al. v. Venture Stores, Inc.*, 56 F.3d 771, 775 (7th Cir. 1995);

*Kleinhans v. Lisle Sav. Profit Sharing Trust*, 810 F.2d 618, 625 (7th Cir. 1987). If the facts of

the case and the representations made have not changed since the filing of the original

complaint, this too will weigh towards denying leave to amend. *Cont'l Bank, N.A. v.

Meyer*, 10 F.3d 1293, 1298 (7th Cir. 1993) (affirming the district court's denial of leave to

amend and noting, "[t]hese facts could have been pled at any time after the filing of the

initial complaint"); *see also Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 788, 793

(7th Cir. 1999) (finding that the plaintiff's motion would cause undue delay to the non-

moving party when it was filed one year and four months after the original complaint,

six months after the end of discovery, and five months after the discovery of allegedly

new facts that required the amendment).

Denial of leave to amend was proper when the moving party "failed to act with

diligence" and attempted to introduce a new issue into the trial days after the discovery

deadline and three months before trial. *Campania Mgmt. Co. v. Rooks, Pitts & Poust*,

290 F.3d 843, 849 (7th Cir. 2002); *see also Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016,

1021 (7th Cir. 1992) (finding that the district court was within its discretion to deny the

plaintiff leave to file a third amended complaint when the plaintiff had notice of the

deficiencies in the complaint and failed to amend it sooner).

Undue delay is most likely to result in undue prejudice when a combination of

the factors listed above - delay in proceedings without explanation, no change in the

facts since filing of the original complaint, and new theories that require additional

discovery - occur together. For example, the Seventh Circuit has found that undue delay resulted in unfair prejudice to the nonmoving party, justifying denial of leave to amend, when the moving party amended its pleading two years after the complaint was filed, the facts and representations in the case had not changed, and the amendment would have required additional discovery. *Cont'l Bank,* 10 F.3d at 1298.

The Seventh Circuit has emphasized that "[t]here must be a point at which a plaintiff makes a commitment to the theory of its case." *Johnson,* 10 F.3d at 1304. Drywall cites two cases - *Johnson* and *Bethany* - that illustrate when a party's attempt to change its theory of the case is so inexcusably delayed as to unduly prejudice the other party.

In *Johnson*, the plaintiff was asking for leave to file a third amended complaint in order to add a "whole new theory of the case" four years after the action had begun. *Id.* The plaintiff's first two complaints in *Johnson* asserted that the defendant, through its doctors, residents, and infectious disease control program had been negligent. *Id.* at 1302. After the defendant moved for summary judgment, asserting in part that the doctors and residents were not its agents, the plaintiff filed a third amended complaint to add claims that the nursing staff and the institution itself had acted negligently towards her. *Id.* at 1302-1303. The court noted that the plaintiff's initial complaint asserted a few specific claims, and once the defendant filed for summary judgment, the plaintiff realized that she would lose based on these specific claims, so she moved to file additional ones. *Id.* at 1304.

In affirming the district court's denial of leave to amend, the *Johnson* decision emphasized the plaintiff's choice to rest her claims on the negligence of the doctors and her failure to alter this choice until after summary judgment proceedings were initiated. *Id.* The plaintiff's delay in changing her theory of the case unduly prejudiced defendants because the first two complaints focused the issues narrowly so that the defendants were surprised by the new allegations, the defendant had already moved for summary judgment based on the first two complaints, and it was likely that the new complaint would subject the defendant to substantial new discovery. *Id.*

In *Bethany*, the plaintiff originally filed a suit for breach of contract against defendant QVC claiming that a representation made by a third party established a binding contract between the two litigants. 241 F.3d at 858. When Bethany replied to QVC's motion for summary judgment, it also sought leave to amend its complaint to add a claim of promissory estoppel. *Id.* at 858-59. The district court found that the third party had no apparent authority to bind QVC and even if she had, the letter she sent to Bethany was an offer and not an agreement. *Id.* at 859. The district court refused to allow Bethany to amend its complaint to add a claim of promissory estoppel because the promissory estoppel claim would be futile. *Id.* at 44.

The Seventh Circuit affirmed the lower court's decision in *Bethany*; but what is especially relevant to the case at hand is that the Seventh Circuit stated that apart from futility grounds "we believe the court also could have denied Bethany's request on the ground of undue delay." *Id.* at 861. *Bethany* determined that undue delay could have

been an "alternate ground for decision" because the factual basis for the promissory estoppel and breach of contract claims were "virtually identical," Bethany did not explain why it waited until QVC filed a summary judgment motion to ask for leave to amend, discovery had already closed, and QVC had already briefed its summary judgment motion. *Id.* at 861-862. The Seventh Circuit explained that an exercise of "appropriate foresight" by Bethany could have avoided postponement of the case's resolution, and the Seventh Circuit does "not require a district court to tolerate such delays." *Id.* The Seventh Circuit did not state how much time had passed between the filing of the original and amended complaints or between the close of discovery and the amended complaint.

The court will now determine whether the factors by which undue delay becomes unfair prejudice are present in the case at hand. First, the facts underlying JPMC's original and proposed claims are the same. JPMC stated in its motion to amend that the "facts giving rise to the new claims are the same as the facts for the original claim," (Pl.'s Mot. to Am. Compl. 4, DE # 68) thus essentially admitting that it could have moved to amend its complaint long before it moved for summary judgment. *Kleinhans*, 810 F.2d at 625. While JPMC argues that some documents were available to it for the first time during the summary judgment briefing, as explained below, the court finds that there are very few documents that were first available at that stage and that JPMC could have procured that information earlier during the discovery process.

Second, even though the new and proposed claims arise from the same facts, JPMC is introducing new theories of recovery into the case two years after the action commenced. Drywall argues that for the last two years it has been litigating a "simple breach of contract" claim and all discovery and pretrial work has been directed towards this claim. (Def.'s Resp. to Mot. to Am. Compl. 8, DE # 73.) Drywall notes that the amended complaint would add equitable claims to the original legal breach of contract claim. (*Id.*) Drywall contends that the amended complaint "requires the parties to litigate an entirely new case" and that it will be forced to "incur significant attorney fees to conduct substantial new discovery" and to analyze and prepare defenses to the new claims. (*Id.*)

*Bethany* is particularly applicable to the case at hand because JPMC, like Bethany, is asking to add equitable claims of relief to a simple breach of contract claim after the summary judgment stage has been reached. As in *Bethany*, the factual basis for the breach of contract and equitable claims are "virtually identical," but the proposed new theories of recovery still pose an unexpected surprise to the defendants at a late stage in the litigation. *See Crest Hill Land Dev., L.L.C. v. City of Joliet,* 396 F.3d 801, 804 (7th Cir. 2005) ("'Surprises' such as new arguments or defense theories propagated after the completion of discovery and filing of summary judgment are wisely discouraged.")

While the proposed new claims here are similar to the original claims, they are not more similar to each other than the claims of promissory estoppel and breach of contract in *Bethany* and thus still pose a "surprise" to Drywall, especially when

14

introduced after JPMC's summary judgment motion and at such a late stage in the litigation. Further, as will be discussed in the next section, the proposed new claims do appear to require new discovery.

Because the facts of the case have remained the same for two years and the proposed amendment injects new theories of recovery into the case at a late stage, the third factor, whether JPMC has adequately explained its reason for waiting until after summary judgment to file for leave to amend, is important.

In its motion to amend its complaint, JPMC only asserts one reason for not amending its complaint sooner–that "based upon the Court's Orders denying the Bank's Motion for Summary Judgment and the Bank's Motion to Reconsider, this case may not be able to be resolved based upon the focused pleadings raised by the Bank" in its original complaint. (Pl.'s Mot. to Am. Compl. 3, DE # 68.) Further, as noted earlier, JPMC stated that "[t]he facts giving rise to the new claims are the same as the facts for the original claims." (*Id.* at 4.)

In response to JPMC's motion for leave to file an amended complaint, Drywall argues that there was no reason that JPMC couldn't have included the four new claims in its original complaint. (Def.'s Resp. to Mot. to Am. Compl. 5, DE # 73.) Drywall correctly argues that "[t]he Bank does not contend that the four new claims and theories of recovery arose during the discovery process and could not have been alleged when it filed its original [c]omplaint more than two years ago." (*Id.* at 5.) In reply, JPMC argues that it needed to amend its complaint at the post-summary judgment stage because

15

"during briefing on summary judgment, Drywall raised the issue of authority." (Pl.'s Reply to Mot. to Am. Compl. 7, DE # 76.) In a later response, JPMC claims that while Drywall's answer "generically raised the issue of authority in its affirmative defenses," not until its summary judgment briefing did Drywall detail its defense that the draws violated the corporate resolution and submit several new materials detailing this defense. (Pl.'s Limited Resp. to Mot. to Am. Compl. 2, DE # 82.)

JPMC has not provided an adequate explanation for its two-year delay in filing its motion to amend. First, it is not an adequate explanation that JPMC felt it had to amend its complaint because it was dissatisfied with the court's decision on its summary judgment motion. *Cf. Conyers v. Abitz*, 416 F.3d 580, 583, (7th Cir. 2005) (affirming district court's decision to deny leave to amend two years after the original complaint was filed and rejecting plaintiff's argument that he should be able to add new claims after the court had dismissed one of his claims because he felt that the court had "mistakenly and inadvertently" failed to address claims implicit in his original complaint). In fact the Seventh Circuit has approved denials of leave to amend because the moving party appeared to be trying to avoid the consequences of a summary judgment decision. *Kleinhans,* 810 F.2d at 625 (finding that the moving party's explanation was inadequate when the facts underlying the proposed new claim had been available to the moving party for eighteen months and the motion to amend "represent[ed] an apparent attempt to avoid the effect of summary judgment") (internal quotation omitted).

Second, the court is not persuaded by JPMC's argument that it could not have amended its complaint before Drywall's summary judgment briefing. As JPMC notes itself, Drywall's answer raised the issue of the allegedly unauthorized draws in five of its thirteen affirmative defenses. (Pl.'s Limited Resp. 1-2, DE # 82; Def.'s Answer 3-6, DE # 9.) In its counterclaim and the accompanying allegations, Drywall also discussed the issue of the draws being authorized, claiming that Treat was the only person authorized to make the draws and that JPMC breached the contract by violating the terms of the corporate resolution. (Def.'s Answer 6 -9, DE # 9.) Although JPMC claims that Drywall did not detail its argument that the draws violated the corporate resolution in its summary judgment briefing (Pl.'s Limited Resp. 2, DE # 82), in its answer filed on May 31, 2007, Drywall pleaded that Treat was the only person authorized in the corporate resolution to make draws on the line of credit (Def.'s Answer 4, DE # 9) and attached a copy of the corporate resolution (Ex. 1 to Def.'s Answer, DE # 9-2) putting JPMC on notice that it might need to address the issue through discovery.

What's more is that JPMC dedicated four and a half pages of its brief in support of its summary judgment motion to the question of whether the draws were authorized. (Pl.'s Mot. for Summ. J. 14 - 18, DE # 39.) JPMC argued that Treat himself authorized a portion of the draws and that Drywall ratified each of the draws. (*Id.* at 14.) Although JPMC didn't address the corporate resolution at that time, it certainly had the opportunity to do so given Drywall's answer filed over a year earlier. In its

interrogatories, to which Drywall responded on June 3, 2008, JPMC also asked extensive questions about who was authorized to make draws on the notes, the process of hiring and supervising Robbins, the scope of Robbins' authority, Drywall's precautions for preventing embezzlement, and Drywall's claims that JPMC breached its contractual obligations to Drywall by allowing an unauthorized person to make draws against the note. (Def.'s Resp. to Mot. to Am. Compl. 2-14, DE # 79-2.) These interrogatories also indicate that JPMC understood the importance of Drywall's unauthorized person claim well before the summary judgment stage.

JPMC claims that there were "numerous additional materials" in two parts of the appendix to Drywall's summary judgment response (specifically the materials at DE ## 59-2 and 59-3, Treat's and Lorie Weaver's ("Weaver") affidavits and their accompanying exhibits) that had not been previously provided to it during discovery and these were the materials "upon which the Bank sought leave to assert additional causes of action." (Pl.'s Limited Resp. 2, DE # 82.) The following documents were included in these two parts of the appendix:

**Affidavit of James Treat (DE # 59-2 at 2-10);**

Exhibit A: the promissory note (DE # 59-2 at 3, 12-13);

Exhibit B: the security agreement (DE # 59-2 at 3, 15-19);

Exhibit C: the corporate resolution (DE # 59-2 at 3, 21);

Exhibit D: a copy of the letter that Treat allegedly sent to JPMC, produced by JPMC (DE # 59-2 at 5, 23);

Exhibit E: copies of four priority mail envelopes addressed to Drywall from JPMC (DE # 59-2 at 6, 25-28);

Exhibit F: copies of two express mail order forms (DE # 59-2 at 6, 30-31);

Exhibit G: the first page of three bank statements provided to Drywall by JPMC during discovery (DE # 59-2 at 6, 33-35);

Exhibit H: a detailed summary of the funds Robbins embezzled from Drywall's checking account (DE # 59-2 at 8, 37-42);

Exhibit I: Robbins' petition to enter a guilty plea. (DE # 59-2 at 9, 44-49.)

**Affidavit of Lorie Weaver (DE # 59-3 at 2-8);**

Exhibit A: copies of four priority mail envelopes addressed to Drywall from JPMC (DE # 59-3 at 9-12);

Exhibit B: copies of two express mail order forms (DE # 59-3 at 14-15);

Exhibit C: the first page of three bank statements provided to Drywall by JPMC during discovery (DE # 59-3 at 5, 17-19);

Exhibit D: a detailed summary of the funds Robbins embezzled from Drywall's checking account (DE # 59-3 at 6, 21-40);

Exhibit E: copies of the checks, wire transfer confirmations, and other documents showing Robbins' embezzlement of funds. (DE # 59-3 at 6, DE # 59-3 at 28-40; DE # 59-4 at 1-59; DE # 59-5 at 1-69; DE # 59-6 at 1-31.)

JPMC does not specify which documents were not provided to it during discovery. Clearly some of these documents, such as Exhibits A, B and C to Treat's

affidavit, that were attached to either the complaint or the answer, and Exhibits D and G, that were provided by JPMC during discovery, were available to JPMC before the summary judgment briefing. Other documents appear to have been made available to JPMC through the state court litigation. For example, JPMC attached a copy of Drywall's verified response to JPMC's motion to dismiss in state court to its summary judgment brief in this case. (DE # 39-13.) This document was filed on October 5, 2007, (*Id.*) and states that its appendix includes a copy of all forged third party checks (*Id.* at 5) and summaries of checks and wire transfers made from Drywall's checking account which would appear to be similar to the documents included in Exhibit E. (*Id.* at 4.)

Further, 171 pages of the appendix, Exhibit E to Lori Weaver's affidavit, are copies of Drywall's checks and wire transfers made from Drywall's checking account, summarized by year. It appears to the court that, even if these documents were not provided in the state litigation, JPMC must have had access to copies of all of these checks, at least the ones that were cashed, and wire transfer statements since they were made from the account that it administered.

Still other documents, such as Exhibits A and B to Weaver's affidavit and E and F to Treat's affidavit were brought to JPMC's attention in Drywall's response to the former's interrogatories. (Def.'s Sur-reply to Mot. to Am. Compl. 8, DE # 79-2.) Drywall stated that it discovered information that indicated that Drywall's statements were not mailed and that Robbins personally picked up the statements. Drywall stated that it would produce any documents related to this interrogatory, which would presumably

be the envelopes and express order forms. (*Id.*) Additionally, when asked about its knowledge of any other civil or criminal litigation relating to Robbins' conduct, Drywall provided information about the criminal case against Robbins including reference to the case number, the plea agreement, and the fact that all of the documents related to the case were public. (*Id.* at 6.) So JPMC could have procured Robbins plea agreement, Exhibit I to Treat's affidavit, well before Drywall's summary judgment briefing.

Although JPMC complains that Drywall's appendix filed in support of its brief in opposition to summary judgment was 278 pages long (Pl.'s Limited Resp. to Mot. to Am. Compl. 2, DE # 82), it seems to the court that the bank had access to at least 221 pages (including the pages separating documents) before the summary judgment briefing. Further, the substance of Treat and Weaver's affidavits do not appear to introduce factual allegations that JPMC would not have already been aware of from Drywall's answer, other documents such as the corporate resolution, and Drywall's interrogatory responses.

In sum, the court has carefully examined all of the documents in this case's docket and it cannot fathom how JPMC would not have had access to the facts underlying its proposed new legal theories until the summary judgment stage. JPMC seems to have been on notice of all of the facts that could support claims of unjust enrichment, recoupment, breach of account rules and regulations, and recision from the very beginning of this litigation. To the extent that JPMC downplayed the corporate resolution and Drywall's unauthorized draws argument, that appears to have been a

matter of choice, not one of ability. Therefore, the court finds that JPMC's explanation for delaying its addition of these new claims is inadequate.

A fourth factor for determining whether undue delay has resulted in unfair prejudice, whether the proposed amendment would require reopened and/or duplicated discovery, is discussed in the next section. At this point, the court notes that the amended complaint would require new discovery and would further postpone resolution of this case. Overall, the court finds that JPMC's inadequately explained undue delay in filing for leave to amend would cause unfair prejudice to Drywall if the motion were granted.

B. *Unfair Prejudice*

The amount of unfair prejudice to the nonmoving party is a "significant factor" in determining whether to grant leave to amend, and it is often considered together with undue delay. *Dubicz*, 377 F.3d at 792. Undue prejudice has been found to exist when an amended complaint would require the non-moving party to engage in substantial discovery and when it would deprive the non-moving party of a summary judgment victory. *Johnson*, 10 F.3d at 1304. Courts have also found that unfair prejudice was created when the moving party intended to introduce an entirely new legal theory that would require discovery to be reopened and force the non-moving party to "duplicate its efforts." *Murphy*, 691 F.2d at 353-54 (district court did not abuse discretion in denying plaintiffs an opportunity to amend when the motion was filed six weeks

before trial, two years after the original complaint was filed, and several months after discovery was finished).

In another decision, the Seventh Circuit found that undue delay resulted in unfair prejudice when the plaintiff moved to file an amended complaint to add additional defendants one year after the original complaint and at the very end of the discovery deadline. *Perrian*, 958 F.2d at 195. Further, as Drywall points out, the Seventh Circuit has also found that parties have engaged in prejudice-producing undue delay when they waited to amend pleadings without explanation until after summary judgment motions have been filed, briefed, or decided. *Bethany*, 241 F.3d at 861.

On the other hand, courts have found that a finding of unfair prejudice cannot be supported only by conclusory arguments that the non-moving party will be prejudiced by a discovery delay because the memories of witnesses have faded and documents have been lost. *Dubicz*, 377 F.3d at 793 (finding that no unfair prejudice resulted to defendant from plaintiff's eight month delay in filing a motion to amend after her complaint had been dismissed when the case had not proceeded beyond the pleadings stage and the statute of limitations had not yet run). There must be some specifics about how reopened discovery will cause unfair prejudice. Still, the party moving to amend ultimately carries the burden of proof to show that no unfair prejudice will result to the non-moving party. *King v. Cooke*, 26 F.3d 720, 724 (7th Cir. 1994).

In the case at hand, granting leave to amend would result in unfair prejudice to Drywall because it would deprive Drywall of some of the benefits of briefing and

23

surviving summary judgment, introduce a new theory of the case at a late stage requiring Drywall to duplicate discovery and litigation efforts, subject Drywall to reopened discovery, and the addition of the new claims at this stage was not foreseeable.

First, like the plaintiff in *Johnson*, JPMC seems to be admitting that it now thinks it may lose based on the result of its summary judgment motion. JPMC admits that the impetus for its filing of an amended complaint was its dissatisfaction with the court's resolution of its summary judgment claim. JPMC states in its motion for leave to amend that the four new claims "represent alternative theories for recovery that the bank did not earlier anticipate that it would need to pursue, but which are now necessary to assert given the [c]ourt's rulings on summary judgment." (Pl.'s Mot. for Leave to File Am. Compl. 3, DE # 68.) The court notes that the Seventh Circuit has found that undue delay is not adequately explained by the simple reason that the plaintiff did not find it necessary to assert the new claims sooner. *Johnson*, 10 F.3d at 1304.

While this case differs in some ways from those cases in which denial of leave to amend was affirmed in part because the motion was initiated at or after the summary judgment stage, many of the concerns that drove those decisions still exist here. In the cases cited by the parties, discovery, including depositions, had usually ended and the party that was seeking to amend the complaint was not the party that moved for summary judgment. *See e.g., Kleinhans,* 810 F.2d at 625 (plaintiff moved to amend the complaint eighteen months after he filed his original complaint, six months after the

close of discovery, and after the defendant's summary judgment motion had been granted); *Bethany*, 241 F.3d at 862 (discovery closed and non-moving party filed and briefed a summary judgment motion); *Cleveland v. Porca Co.*, 38 F.3d 289, 297-98 (7th Cir. 1994) (discovery had been completed and non-moving party's summary judgment motions fully briefed). Part of the justification for denying leave to amend in these cases is that doing so would deprive the party awarded summary judgment "the meaningful value of summary judgment." *Sanders*, 56 F.3d at 774. Another part of the justification is that allowing a new legal theory to be introduced after at least one side has briefed a summary judgment motion would create delays while the nonmoving party responds to the new theory. *Bethany*, 241 F.3d at 862.

Neither party has identified a case where a plaintiff has moved for summary judgment and when that motion has failed, sought to amend its complaint to add alternative liability theories as additional means by which it might prevail at trial, and neither has the court. Nevertheless, the Seventh Circuit's concern–that a late amendment shouldn't be used to deprive a party of the fruit of its summary judgment labors–is still present, but in a somewhat different form, in the current circumstances. Although Drywall doesn't suffer as much prejudice as a defendant deprived of its summary judgment victory, because Drywall has to go to trial whether or not JPMC's motion is granted, Drywall will still suffer the prejudicial impact discussed below. And that prejudice is far greater than that JPMC would suffer if its motion for leave to amend is denied because JPMC still has an opportunity prevail on its original theory of

the case if the motion is denied. JPMC is like a dinner host who thought he could save money and time by serving only a chicken and now that the chicken has turned out not to be enough food for him wants the whole table to wait while he defrosts the turkey.

Drywall argues that it has already successfully opposed JPMC's motion for summary judgment and that it may need to file for summary judgment on one or more of the new claims. (Def.'s Resp. to Mot. to Am. Compl., DE # 73 at 8.) Granting leave to amend to JPMC after its summary judgment motion has been decided would result in unfair prejudice to Drywall because it may have to engage in two separate summary judgment briefings and it would allow JPMC to essentially start over with new theories of recovery after it already asserted that it should win as a matter of law.

Second, granting leave to amend would require new discovery and would require duplication of efforts. In *Campania,* the parties were litigating a breach of contract claim when days after the discovery deadline and three months before the trial date the defendant requested leave to amend its answer to include an agency theory of defense. *Id.* at 849-850. The Seventh Circuit found that allowing the "agency defense would have complicated this straightforward breach of contract dispute by raising additional, complex issues [within days of] the discovery deadline that was agreed upon by both parties." *Id.* at 500.

In this case, it is not as clear as in *Campania* that the new claims would require extensive additional discovery. Drywall does not describe the new discovery that it would be forced to undertake if JPMC were granted leave to amend its complaint.

JPMC argues in response that Drywall will not be prejudiced by undertaking new discovery because the factual allegations in the amended complaint are largely the same as those in the original complaint, depositions have not yet been taken, no new discovery is needed because the new claims involved only Drywall's conduct, and no trial date has been set. (Pl.'s Reply to Mot. to Am. Compl., DE # 76.) JPMC also notes that it would be willing to proceed on the amended complaint without any new written discovery (Def.'s Reply to Mot. to Am. Compl. 5, DE # 76), but that offer does not reduce any potential prejudice to Drywall because Drywall itself needs to be able to decide what discovery is needed to defend against the new legal theories.

In its sur-reply, Drywall again did not address what new discovery the amended complaint would require. (Def.'s Sur-reply to Mot. to Am. Compl., DE # 79.) Nor has it argued that any pieces of discovery are less available to it now than they were two years ago. As noted earlier, it appears that the factual basis for the new claims is very similar to the factual basis for the original claims.

However, in the Seventh Circuit, the "party seeking an amendment carries the burden of proof in showing that no prejudice will result to the non-moving party." *King*, 26 F.3d at 724. JPMC has not met that burden. Its arguments, listed above, do not show that there will be no prejudice to Drywall. Particularly, JPMC argues that no new discovery is needed because the new claims only relate to Drywall's conduct. Even if this is true, it doesn't mean that Drywall won't have to put forth new efforts and expenses to obtain information.

In fact, it appears likely that the new claims would require substantial additional legal work and discovery from Drywall at a very late stage in the litigation. Drywall would incur legal fees in exploring the new claims, and it is likely that new summary judgment motions would need to be filed, delaying the case even further. Drywall would have to go through all of the new claims and analyze whether new discovery was needed. If JPMC had not waited two years to amend its complaint, Drywall could have consolidated its discovery efforts for all six claims at once, saving significant time and expense. *See Campania,* 290 F.3d at 849 ("A trial court may deny leave to amend when the amendment would cause the opposing party to bear additional discovery costs litigating a new issue and the moving party does not offer to reimburse the nonmoving party for its expenses.").

The court discerns that some new discovery would be needed for at least three portions of the plaintiff's proposed complaint: 1) Count III. Unjust Enrichment, ¶ 28: "Upon information and belief, Drywall used proceeds from the draws for legitimate and authorized purposes" (Pl.'s Mot. to Am. Compl. 6, DE # 68); 2) Count IV. Recoupment, ¶ 36: "Drywall gained the benefit of having funds deposited to its corporate checking account" (*Id.* at 7); 3) Count VI. Rescission, ¶ 50: "Had Drywall reviewed its bank statements and monitored its employees and financial information, and otherwise contacted and instructed the Bank not to allow draws against the Note, the Bank would not have processed the draws against the Note and credited proceeds to Drywall's corporate checking account." (*Id.* at 9.)

Also, even though JPMC points out that depositions still need to be taken, it is not surprising that Drywall asserts that "the parties have completed discovery." (Def.'s Resp. 5-6, DE # 73.) That is because when Drywall attempted to compel discovery on January 30, 2009, more than six months before JPMC filed for leave to amend, the court denied Drywall's motions stating that "the discovery period closed over nine months ago." (Order Den. Mots. to Compel and Mot. for Extension of Time, DE # 55.) This was based on the fact that discovery had closed on May 2, 2008 and, although the undersigned had reassigned the case to the magistrate judge for all pending discovery matters on September 23, 2008 (Order Granting Mot. for Extension of Time to File Dispositive Mot. 3, DE # 35.), neither side filed a motion to reopen or extend discovery. (Order Den. Mots. to Compel and Mot. for Extension of Time 1, DE # 55.) The depositions were treated differently than the written discovery because the parties agreed that after the court's ruling on summary judgment the case might be narrowed, and the depositions could focus on the issues that might remain and also possibly avoid duplicate depositions in the related state court litigation or unnecessary depositions if mediation was successful. (Pl.'s Mot. for Extension of Time to Complete Disc. 3.)

At this point the discovery period is long closed and only depositions need to be taken; it is very possible that adding additional theories to the case would require a complete round of new discovery going far beyond the depositions. Thus, the fact that depositions still remain because the parties agreed that taking them after the resolution of dispositive motions would streamline their litigation provides no justification for

JPMC's unilateral desire to amend its complaint to inject new theories of liability in this case, occasioning new discovery and new motions. The court won't sanction JPMC's maneuver to use ongoing depositions allowed for streamlining the case to now justify making the case more cumbersome.

A third consideration in determining whether or not an amendment would inflict unfair prejudice on the non-moving party is the possibility that the non-moving party could have foreseen litigating the new claims. *Campania,* 290 F.3d at 850. Along those lines, some district courts have held that no unfair prejudice exists when the facts on which the new claims was based were "known or available to all parties." *In re Olympia Brewing Co. Securities Litigation*, 674 F.Supp. 597, 606 (N.D. Ill. 1987). Although the facts underlying the four proposed claims have been known to both parties, there was no way for Drywall to foresee that JPMC would introduce these new claims into the litigation at this late stage.

As the Seventh Circuit advised, "[t]here must be a point at which a plaintiff makes a commitment to the theory of its case," *Johnson,* 10 F.3d at 1304, and JPMC appeared to have done that when it filed for summary judgment on October 17, 2008, ten months before it requested leave to amend its complaint. By filing for summary judgment, JPMC expressed its belief that there were no genuine issues of material fact (even before depositions were taken) and that the entire matter could be decided on the breach of contract and foreclosure of security interest claims. (Pl.'s Mot. for Summ. J. 1, DE # 39.) JPMC committed to its theory of the case at that time. It would be unfair to

Drywall to allow JPMC to insert new claims into the litigation at this late stage simply because it felt that its original claims were so strong that it didn't need to litigate other possible claims from the outset.

C.    *Dilatory Motive*

In deciding whether or not to grant a party leave to amend, the court can consider whether the party asking for leave is acting from a dilatory motive. *Foman*, 371 U.S. at 182. Courts can refuse to grant leave to amend, at least in part, because of concern that the motion was a "tactic [ . . . ] to postpone the trial date." *Ferguson v. Roberts*, 11 F.3d 696, 706 -707 (7th Cir. 1993) (finding that the trial court was within its discretion to deny a motion in part based on a dilatory motive when the plaintiffs filed their motion one month before the close of discovery and the new allegations arose from the same transaction as the original complaint); *see also Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1225 (7th Cir. 1988) ("[w]hile FED. R. CIV. P. 15 favors amendments when required by justice, it is not a license for carelessness or game[s]manship.").

Although a trial date has not yet been set in this case, before JPMC filed this motion for leave to amend on August 8, 2009, the parties had until August 22, 2009 to complete their depositions and a trial date would most likely have been set for a date shortly after that. It appears that JPMC pursued its case through the summary judgment stage on the basis of only one legal theory because it thought that one theory presented a fail-proof path to recovery. Now that it has been denied victory at the summary judgment stage, it hopes to increase its odds of winning at trial by adding alternative

legal theories. It is not inconceivable that JPMC is now hoping to delay the trial further, perhaps until after one of the state cases had been resolved against Drywall, a situation that would favor JPMC.

The court is not required to allow delay strategies when the plaintiff could have minimized postponement by introducing its new claims earlier in the litigation. *Feldman,* 850 F.2d 1217 at 1225 ("amendments near the time set for trial may require postponement when the same allegations made earlier would have afforded ample time to prepare without delay. Plaintiff is not entitled to impede justice by imposing even reasonable preparation intervals *seriatim.*"). Here, concern about dilatory motive would not be enough by itself to justify denial of the motion to amend, but it weighs towards a denial when considered with the other factors.

> D.      *Burden on Judicial System*

In deciding whether or not to grant leave to amend, the court can also consider the burden that granting leave to amend would place on the judicial system. *Tamari,* 838 F.2d at 909. "Beyond prejudice to the parties, a trial court can deny amendment when concerned with the costs that protracted litigation places on the courts. Delay impairs the 'public interest in the prompt resolution of legal disputes.'" *Fort Howard Paper Co. v. Standard Havens, Inc.,* 901 F.2d 1373, 1380 (7th Cir. 1990) (quoting *Tamari,* 838 F.2d at 909). Here the impact of the delay on the judicial system may not have been enough alone to justify denial of the leave to amend. However, allowing JPMC to "change theories midstream" will protract the litigation in this court, and combined

with the factors discussed above, militates towards a finding that leave to amend should not be granted in this case. *Id.*

IV.  **CONCLUSION**

For the foregoing reasons, the court:

(1) **DENIES** the motion to amend (DE # 68);

(2) **GRANTS** the joint motion to modify the deposition deadline (DE # 74);

(3) **ENTERS** the following **SCHEDULING ORDER** which, pursuant to FEDERAL RULE OF CIVIL PROCEDURE 16(b), shall not be modified except upon a showing of good cause: the last day to complete depositions will be **April 5, 2010.**

**SO ORDERED.**

Date: February 3, 2010

   s/James T. Moody              
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT